Lakisha REYNOLDS, et al., Plaintiffs,

v.

Rudolph GIULIANI, et al., Defendants.

No. 98 Civ. 8877 WHP.

United States District Court,
S.D. New York.

Jan. 25, 1999.

Marc Cohan, Rebecca L. Scharf, New York City, NY, for plaintiffs.

Christopher D. Lamb, Hwan–Hui Helen Lee, Scott A. Rosenberg, The Legal Aid Society, New York City, NY, for plaintiffs.

Mary Ellen Burns, Northern Manhattan Improvement Corp., New York City, NY, for plaintiffs.

Jonathan Pines, Assistant Corporation Counsel, New York City, NY, for the City defendants.

James M. Hershler, Assistant Attorney General, New York City, NY, for the State defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

On December 16, 1998, plaintiffs Lakisha Reynolds, Georgina Bonilla, April Smiley, Lue Garlick, Adriana Calabrese, Jenny Cuevas and Elston Richards ("plaintiffs") filed this action under 42 U.S.C. § 1983 against New York City Mayor Rudolph Giuliani and Jason Turner, Commissioner of the New York City Human Resources Administration (the "City defendants"), together with Brian J. Wing, Commissioner of the New York State Office of Temporary and Disability Assistance, and Barbara DeBuono, Commissioner of the New York State Department of Health (the "State defendants"). The class action complaint alleges that the City systematically prevents otherwise eligible individuals from obtaining food stamps, Medicaid and cash assistance by, *inter alia*, imposing unreasonable requirements upon such individuals during the application process.

Plaintiffs seek preliminary and permanent injunctive relief on behalf of a proposed class of all New York City residents who have or will apply for food stamps, Medicaid and/or cash assistance. Presently before the Court is plaintiffs' motion for a preliminary injunction.[1] For the reasons below, plaintiffs' motion is granted in part.

1. Given the parties' request to conduct discovery concerning the issues raised by the request for preliminary injunctive relief and the need to determine that application on an expedited basis,

## PROCEDURAL HISTORY AND BACKGROUND

### A. *Introduction*

New York City's Human Resources Administration ("HRA") is the public agency charged with making food stamps, Medicaid and cash assistance available to needy individuals. At the present time, HRA is re-engineering the way in which its approximately 18,000 employees accomplish that mission. Until recently, HRA processed applications for food stamps, Medicaid and cash assistance at offices known as "Income Support Centers." However, in March 1998 HRA began converting its 31 Income Support Centers to "Job Centers" in an effort to effectuate changes in federal and State welfare policy.

Those policy changes unfolded with the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). (*See* Smith Decl. ¶ 1; Lee Decl. ¶ 3.) PRWORA dramatically changed the climate for welfare programs in New York and around the country. Among other things, PRWORA ended the Aid to Families with Dependent Children ("AFDC") program and replaced it with a block grant program known as the Temporary Assistance to Needy Families ("TANF").

One of the express statutory purposes of TANF is to "end the dependence of needy parents on government benefits by promoting job preparation, work and marriage." 42 U.S.C. § 601(a)(2). TANF contains several provisions meant to encourage cash assistance recipients to obtain paid employment. For example, TANF requires that non-exempt parents or caretakers engage in work activities no later than 24 months after receipt of assistance. *See* 42 U.S.C. § 602(a)(1)(A)(ii). TANF also establishes a 5–year lifetime limit on benefits, under the expectation that recipients will secure employment to support their children and themselves. *See* 42 U.S.C. § 608(a)(7). To ensure that States require recipients to work,

the Court deferred consideration of plaintiffs' request for class certification with the consent of the parties.

TANF includes escalating "work participation rates" that States must meet to avoid reductions in their block grants. *See* 42 U.S.C. § 607. New York participates in TANF through two cash assistance programs: Family Assistance, which is available to pregnant women and families with a minor child, and Safety Net Assistance, which is available to childless adults. *See* N.Y. Social Services Law §§ 158 and 349.

The City defendants maintain that the procedures utilized at job centers implement these policies by focusing on the employment opportunities and responsibilities of applicants, while assuring that assistance is available to those in need. (*See* Smith Decl. ¶¶ 2, 8.) HRA has already converted 14 of its 31 income support centers to job centers. HRA plans to complete the conversions by April 1999. (*See* Smith Decl. ¶ 5.)

Apart from providing cash assistance through the Family Assistance and Safety Net Assistance programs, HRA's job centers are responsible for administering the federal food stamps and Medicaid programs. The following sections provide a brief overview of those programs.

### 1. The Food Stamp Program

Congress established the federally funded, State-administered food stamp program in 1964 to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. To be eligible for food stamps, a household's net income must be equal to or below the federal poverty line, as defined in 42 U.S.C. § 9202(2), and its available financial resources may generally not exceed $2,000. *See* 7 U.S.C. §§ 2014(c), (g). New York participates in the food stamp program, and therefore is bound to comply with all applicable federal requirements. *See generally Rothstein v. Wyman,* 467 F.2d 226, 232 (2d Cir.1972).

Under the Food Stamp Act, a State agency is required to establish procedures governing the operation of food stamp offices that best serve households in the State. *See* 7 U.S.C. § 2020(e)(2)(A). In carrying out this mandate, a State agency must "provide timely, accurate, and fair service to applicants for,

and participants in, the food stamp program." *See* 7 U.S.C. § 2020(e)(2)(B)(i). A household is entitled to apply for food stamps on the first day it contacts a food stamp office during business hours. See 7 U.S.C. § 2020(e)(B)(iii). The State agency must provide eligible applicants that complete the initial application process with food stamps as soon as possible, but no later than 30 calendar days following the date the application was filed. *See* 7 U.S.C. § 2020(e)(3); 7 C.F.R. § 273.2(g).

### 2. "Expedited" Food Stamps

Expedited issuance of food stamps is generally available to households with very little income and liquid resources, households whose housing costs exceed their income and liquid resources, and certain migrant and seasonal worker households. *See* 7 U.S.C. § 2020(e)(9)(A)(i)–(ii); 7 C.F.R. § 273.2(i)(1). If eligible, an applicant for expedited food stamps must receive them no later than seven days after the date of application. *See* 7 U.S.C. § 2020(e)(9). The State agency's application procedures must be designed to identify households eligible for expedited service at the time the household requests assistance. *See* 7 C.F.R. § 273.2(i)(2).

### 3. Medicaid

Medicaid, enacted in 1965 as Title XIX of the Social Security Act, *see* 42 U.S.C. § 1396 *et seq.,* is a jointly financed federal-state program designed to provide medical assistance to those who lack sufficient income and resources to pay for health care. A State that choses to participate in the Medicaid program must implement a plan that complies with all applicable federal statutes and regulations.

New York State participates in the Medicaid program by providing financial assistance for medical services for both the "categorically needy," which includes the aged, blind, disabled and needy individuals with dependent children, as well as the "medically needy." *See* 42 U.S.C. § 1396a(a)(10)(A), (C). Federal law generally requires that applications for Medicaid be processed and eligibility determined within 45 days, 42

C.F.R. § 435.911(a)(2), except where the applicant claims a disability, in which case the application must be processed in 90 days. *See* 42 C.F.R. § 435.911(a)(1).

## B. *Factual Background*

The following factual summary is derived from the parties submissions and is intended to provide background for the discussion that follows.

### 1. *Application Process Under The Income Support System*

In the income support centers, any individual seeking public assistance is provided with a State-approved joint application form for food stamps, Medicaid, and cash assistance, together with screening forms for domestic violence and alcohol and substance abuse. (*See* Lee Decl. ¶ 8.) Such individuals may qualify for either the Family Assistance Program or Safety Net Assistance. (*See* Lee Decl. ¶ 8 n. 1.) During that visit, the application specialist registers the applicant and schedules appointments with Eligibility Verification and Review ("EVR"), the Office of Child Support Enforcement ("OCSE"), and the "I" interview. The "I" interview is the full application interview that generally takes place within five to seven days of the application date. However, if the applicant has emergency needs, the "I" interview will take place on the application date.

### 2. *Application Process Under The Job Center System*

The application process at job centers is more rigorous. After an initial interview with a Financial Planning Unit Receptionist, the applicant is required to meet with a Financial Planner, an Employment Planner, a Social Services Planner, and to engage in extensive job search activities before the "I" interview.

On arrival at a job center, the applicant is screened by a receptionist who inquires as to the type of assistance sought and the applicant's zip code. (*See* Smith Decl. ¶ 9.) The receptionist explains that cash assistance is now subject to a time limit, and that the applicant will be required to seek employment during the application process. Then the receptionist provides the applicant with a Participant Job Profile and Assessment Form ("PJP"). Completion of the PJP triggers the application process.

After the applicant submits the completed PJP to a receptionist, a Financial Planning Unit Supervisor reviews the PJP, logs the applicant's name into the Job Center Daily Activity Log, and assigns the applicant to a financial planner. While the applicant is waiting for his appointment with the financial planner, receptionists often make announcements informing applicants about the time limits for public assistance. (*See* Kahn Decl. ¶ 4; Smith Decl. ¶ 12.)

Applicants are registered in the Welfare Management System ("WMS") on the day the PJP is completed. The agency's timeliness in complying with federal and state mandates with regard to food stamps, Medicaid, and cash assistance applications is measured from the date the PJP is completed. (*See* Smith Decl. ¶ 12.) Thus, the formal application process under both the income support centers and the job centers begins on the first day that the applicant enters the office and completes the document required by that office. (*See* Smith Decl. ¶ 12.)

After completing the PJP, the applicant meets with a financial planner, who reviews the PJP and interviews the applicant to determine if any emergency needs requiring an immediate response are present. Applicants are customarily handed a form entitled "Information About an Expedited Food Stamp Interview." Applicants are considered for expedited food stamps if they request an expedited food stamp interview on this form. (*See* Flaum Decl. ¶¶ 8, 22, 36, 49, 73, 83, 103.)

If there is an emergency need, the financial planner either determines the applicant's eligibility for emergency benefits or arranges to have the applicant evaluated by an emergency assistance team or the Homeless Diversion Unit. (*See* Smith Decl. ¶ 20.) After any emergency is addressed, the financial planner explores whether there are any potential alternatives to cash assistance. These alternatives include whether the applicant has relatives who can assist him, access to bank accounts, or other possible sources of

government benefits, such as veterans' benefits, pension, social security, and community services. In addition, the applicant is reminded about the time limits relating to cash assistance. (*See* Smith Decl. ¶ 16.) At the conclusion of this interview, the financial planner schedules the remaining appointments that the applicant is required to attend, including the Employment Planner interview, the Social Services interview, the "I" interview, and job search orientation activities.

After meeting with the financial planner, the applicant is interviewed by the employment planner. The employment planner is responsible for connecting the applicant with work activities. If the applicant is not exempt from work activities, then the applicant is immediately assigned job search activities.[2] The employment planner reviews with the applicant a calendar called the "35/50 Days to Employment Calendar" which charts the appointments the applicant is expected to keep and outlines the steps that should be taken to search for and obtain employment. Following an orientation, daily job search activities are then scheduled over a six week period.

At some point, after the job search orientation and while the applicant is still performing job search activities, the "I" interview is scheduled.[3] Assuming the applicant has submitted all of the required paperwork and documentation and has appeared for all scheduled appointments, this is the phase where an eligibility determination is made. (*See* Smith at ¶ 42.)

When evaluating an applicant's entire application, separate determinations should be made for each type of assistance requested. A separate determination is necessary because the requirements and standards under each program are different. For example, while work requirements exist for cash assistance, they do not affect eligibility for food stamps or Medicaid. If the applicant requests only food stamps and/or Medicaid, job

center staff are required to give an immediate referral to a non-public assistance food stamp or Medicaid office. Income support centers and job centers are only authorized to process joint applications for food stamps and/or Medicaid in conjunction with a request for cash assistance. (*See* Smith Decl. ¶ 19.)

### C. *The Complaint*

Plaintiffs allege that the City defendants are providing applicants with false and misleading information in an effort to prune the welfare rolls. Plaintiffs further allege that the City defendants are impermissibly raising impediments to applications by needy individuals for food stamps, Medicaid and cash assistance. Their 57–page complaint alleges twelve separate claims for relief. Plaintiffs' first seven claims for relief assert private rights of action based on alleged violations of various federal statutes and regulations. Specifically, plaintiffs allege that:

- Defendants' policies[ ] and practices of deterring, discouraging and preventing individuals and families from filing applications for food stamps benefits violate plaintiffs' and plaintiff class members' rights under 7 U.S.C. § 2020(e)(2); 7 C.F.R. §§ 273.2(c)(2), (6), (e)(1), (g); 272.5, 273.2(g); 273.10.

- Defendants' policies[ ] and practices of deterring, discouraging and preventing individuals and families from filing applications for expedited food stamps benefits violate plaintiffs' and plaintiff class members' rights under 7 U.S.C. § 2020(e)(9); 7 C.F.R. §§ 273.2(i)(2), (3).

- Defendants' policies[ ] and practices of failing to determine plaintiffs' eligibility for food stamps separate from their eligibility for cash assistance violate plaintiffs' and plaintiff class members' rights under 7 U.S.C. § 2014(b) and 7 C.F.R. §§ 273.2(j)(1)(iii) and 273.10(i).

---

**2.** Applicants are not always immediately assigned to conduct job search activities. For example, if an applicant needs assistance in locating child care services or help caring for a member of the applicant's family, a referral to the Social Services Planner might be appropriate. Once these issues have been addressed, the

applicant proceeds to the job search phase immediately.

**3.** Normally, the "I" interview is held within five working days of the initial application date. *Id.* at ¶ 40.

- Defendants' policies[ ] and practices of failing to contact applicants who withdraw their food stamps applications to confirm the withdrawal and to advise them of their right to reapply at any time violates 7 C.F.R. §§ 273.2(c)(6), 273.10.
- Defendants' policies[ ] and practices of deterring, discouraging and preventing individuals and families from filing applications for Medicaid benefits violate plaintiffs' and plaintiff class members' rights under 42 U.S.C. § 1396a(8); 42 C.F.R. §§ 435.905(a)(1)–(3), 435.906, 435.909, 435.913, 435.930.
- Defendants' policies[ ] and practices of failing to determine an individual's eligibility for Medicaid separate from their eligibility for cash assistance violate plaintiffs' and plaintiff class members' rights under 42 C.F.R. § 435.909.
- Defendants' policies[ ] and practices of not sending notices to applicants who withdraw their Medicaid applications to confirm that those withdrawals are voluntary violates 42 C.F.R. § 435.913.

Compl. ¶¶ 255–61. Plaintiffs assert that these violations also support individual claims under 42 U.S.C. § 1983. The complaint further alleges violations of plaintiffs' rights under State law, *see* Compl. ¶ 262, and asserts that the State defendants' failure to adequately monitor the City's administration of the food stamps and Medicaid programs violates plaintiffs' rights under 7 U.S.C. § 2020 and 42 U.S.C. § 1396, respectively. *See* Compl. ¶¶ 265–66. The common thread running through all of plaintiffs' claims is that defendants have and continue to violate plaintiffs' federal due process rights.

D. *Procedural History*

By order to show cause on December 16, 1998, plaintiffs sought a temporary restraining order: (1) enjoining the City defendants from converting any additional income support centers to job centers; and (2) directing the City defendants to expeditiously process the applications of the named plaintiffs. Following oral argument later that day, this Court entered a temporary restraining order directing the City to provide emergency food stamps and cash assistance to the named plaintiffs. This Court scheduled an evidentiary hearing for December 30, 1998.

On December 23, 1998, the parties sought to adjourn the hearing in order to conduct limited discovery. This Court granted that request, established an expedited discovery schedule, and adjourned the evidentiary hearing to January 14, 1999. The temporary restraining order was modified on consent to provide for an "informal intervention procedure" to address individual cases of exigent need for "expedited food stamps" and/or "emergency cash assistance."

As the hearing date approached, the parties requested additional time to continue compromise negotiations in an effort to resolve the litigation. This Court granted that request and adjusted the discovery and pre-hearing briefing schedules to accommodate the parties' needs. On January 14, 1999, the parties advised the Court that they were unsuccessful in their efforts to settle the action. The hearing date was rescheduled to January 20, 1999. Between January 15 and 19, this Court supervised discovery, issued memoranda and orders concerning various evidentiary privileges, and received the parties' voluminous pre-hearing submissions.

The Court conducted an evidentiary hearing concerning plaintiffs' application on January 20, 21 and 22, 1999, and heard testimony from 15 witnesses. The Court also received three volumes of exhibits and hundreds of pages of deposition transcripts from the parties to supplement the record.

At the conclusion of the hearing, this Court announced that it would render a decision on Monday, January 25, 1999. Following that announcement, plaintiffs sought a representation from City defendants that the City would not proceed with its planned conversion of the DeKalb Income Support Center on January 25 until after the Court issued its decision. The City defendants refused to delay the conversion scheduled for Monday morning.[4] Accordingly, the Court modified

---

4. The City defendants previously put off that conversion in order to adjourn the evidentiary hearing until January 20, 1999.

its temporary restraining order to enjoin the City from converting any Income Support Centers on January 25, 1999. (*See* Hr'g Tr. at 684.)

## DISCUSSION

### A. The Applicable Standard For Preliminary Injunctive Relief

■ A party seeking a preliminary injunction generally must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

■ "However, in a case in which 'the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir.1996) (applying higher standard to motion to enjoin enforcement of city regulation prohibiting unlicensed public exhibits of visual art) (*quoting Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997). *See also Velazquez v. Legal Services Corporation*, 164 F.3d 757, 764 (2d Cir. 1999) (applying higher standard in action challenging the constitutionality of federal statute and regulations). "This exception reflects the idea that governmental policies implemented through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995).

■ An even higher standard may apply where the injunction provides the movant with "substantially all the relief sought." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (*quoting Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995)). In that instance, the moving party must make a "clear" or "substan-

tial" showing of a likelihood of success. *See Doherty*, 60 F.3d at 34. As a final consideration, "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 929 (2d Cir.1997).

■ The City defendants argue that plaintiffs must establish a "clear likelihood of success on the merits to justify the extraordinary relief they seek" because "the public has a considerable interest in having the City meet the requirements of the Federal and State Welfare Reform Acts." (Defs.' Mem. at 55.) This Court declines to impose that heightened standard. However, it is appropriate to require plaintiffs to establish a "likelihood of success" on the merits because the injunction they seek intrudes on the City defendants' ability to exercise their regulatory authority.

The Second Circuit has "offered differing views on the appropriate standard for the issuance of a preliminary injunction against governmental action." *Time Warner*, 118 F.3d at 923. As the present application demonstrates, interpretation of the phrase "pursuant to a statutory or regulatory scheme" depends on where the challenged conduct is found along the continuum of governmental action.

At either extreme, a distinction may be drawn between injunctions directly challenging the enforcement of a statute or regulation from those only seeking the government's compliance with them. For example, the plaintiffs in *Able* fell "squarely within the confines of th[e] exception" requiring application of the "likelihood of success" standard where they sought to overturn the federal statute and regulations implementing the military's "Don't Ask, Don't Tell" policy. *See Able*, 44 F.3d at 131. Similarly, in *Sweeney v. Bane*, 996 F.2d 1384 (2d Cir.1993), the court approved the "likelihood of success" standard where plaintiffs attempted to enjoin the New York State Department of Social Services from implementing a 1992 amend-

ment to N.Y. Social Services Law § 367–a(6). *See also Union Carbide Agric. Prod. Co., Inc. v. Costle,* 632 F.2d 1014, 1016 (2d Cir. 1980) (Medicaid recipients and physicians sought to enjoin state agencies from implementing N.Y.Soc.Serv.Law § 365–a(5)); *Medical Soc'y of the State of N.Y. v. Toia,* 560 F.2d 535, 537 (2d Cir.1977) (producers of pesticide chemicals sought to enjoin enforcement of certain provisions of the Federal Insecticide, Fungicide, and Rodenticide Act).

In contrast, the court in *Carey v. Klutznick,* 637 F.2d 834 (2d Cir.1980), adopted the "serious questions" standard to an injunction directed at the methods adopted by the Census Bureau outside the applicable regulatory framework. *See also Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 836 F.2d 760 (2d Cir.1988) (applying "serious questions" standard in action brought by public interest groups and individuals to prohibit dredging and pier construction on Staten Island pending compliance with the National Environmental Policy Act); *Time Warner,* 118 F.3d at 923 ("serious questions" standard was appropriate where City's action was proprietary in nature).

In one sense, the preliminary relief requested by plaintiffs seeks only to compel the City defendants' compliance with federal and State law. For example, one branch of the preliminary injunction plaintiffs seek would direct defendants to "[p]rocess all applications for food stamps, Medicaid, and cash assistance including applications for expedited food stamps and temporary pre-investigation grants, within the time-frames required by law[.]" (Compl. at p. 53.) However, the plaintiffs also seek to enjoin the City defendants from converting any additional income support centers into job centers until the City makes a host of institutional reforms concerning how the City implements these programs. This aspect of the relief sought by plaintiffs warrants application of the "likelihood of success" standard.

With these considerations in mind, this Court declines plaintiffs' invitation to invoke the narrow exception established in *Haitian Ctrs. Council, Inc. v. McNary,* 969 F.2d 1326 (2d Cir.1992), *vacated as moot,* 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), allowing that the "serious questions" standard may be appropriate where neither party "has an exclusive claim on the public interest." *Haitian Centers,* 969 F.2d at 1339. Plaintiffs need not establish a "clear" or "substantial" likelihood of success because the injunctive relief they seek now will not "render a trial on the merits largely or partly meaningless ..." *Doherty,* 60 F.3d at 35. Instead, plaintiffs "need only make a showing that the probability of [their] prevailing is better than fifty percent. There may remain considerable room for doubt." *Eng v. Smith,* 849 F.2d 80, 82 (2d Cir.1988) (*quoting Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985)).

### 1. *Irreparable Harm*

■ Irreparable harm is " 'the single most important prerequisite for the issuance of a preliminary injunction.' " *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983) (*quoting* 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 2948 at 431 (1st ed.1973)). Accordingly, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990).

■ The Supreme Court has observed that denying welfare benefits to an eligible applicant may deprive that person "of the very means by which to live." *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). "To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury." *Morel v. Giuliani,* 927 F.Supp. 622, 635 (S.D.N.Y.1995). *See also Brown v. Giuliani,* 158 F.R.D. 251, 264–65 (S.D.N.Y.1994).

Plaintiffs' pre-hearing submissions and the evidence adduced at the hearing establish the risk of immediate and irreparable harm unless a preliminary injunction is issued. The City defendants' practices continue to endanger numerous individuals in need of public assistance, including children, expectant mothers, and the disabled. This Court has received declarations and testimony describing in stark detail the hardships endured by

plaintiffs and other individuals who unsuccessfully sought public assistance at job centers. For example, plaintiff Lue Garlick, a homeless, single mother who is pregnant with twins, testified that she attempted to apply for emergency food stamps on November 16, 1998 at the Hamilton Job Center, but did not receive them until December 19, 1998. (Hr'g Tr. 11–12, 14, 22.) During that interim period, Ms. Garlick went entirely without food on more than one occasion. (Hr'g Tr. 14.) Other plaintiffs and witness described similar experiences. (*See e.g.,* Smiley Decl. ¶¶ 14, 21; Reynolds Decl. ¶ 9; Bonilla Decl. ¶ 15; Cuevas Decl. ¶¶ 23–24; Richards Decl. ¶ 13.) Based on the record before this Court, there simply is no question that plaintiffs have established the risk of immediate and irreparable harm.

### 2. Likelihood of Success

As an initial matter, the City defendants argue that plaintiffs cannot prevail on their claims because they cannot maintain a private right of action under section 1983 to enforce provisions of the Food Stamp Act and the Medicaid Act.[5] The State defendants have cross-moved to dismiss plaintiffs' claims against them citing, *inter alia,* the Eleventh Amendment. For the reasons discussed below, the City defendants' argument is rejected.[6] Because no injunction is presently issuing against the State defendants,[7] the Court declines to address the merits ·of the State defendants' cross-motion at this time.[8]

 Section 1983 provides a cause of action against any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). "To determine whether a private right of action exists under a federal statute, a plaintiff must show that the statute is: (1) 'intended to benefit' the plaintiff seeking to enforce it; (2) a 'binding obligation on the governmental unit,' rather than 'merely a congressional preference for a certain kind of conduct'; and (3) not so 'vague and amorphous' as to be 'beyond the competence of the judiciary to enforce.'" *Rodriguez v. DeBuono,* 162 F.3d 56, 60 (2d Cir.1998) (*quoting Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990)). "Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. at 1360.

As summarized above, *supra,* pp. 339–40, the complaint purports to allege claims based on violations of a number of federal statutes and regulations. The provisions upon which plaintiffs rely are quite different than the statute that the Supreme Court analyzed in *Blessing.* Here, plaintiffs have identified several specific provisions of the Food Stamp Act which Congress undoubtedly intended to benefit individuals such as the plaintiffs, and

---

5. In light of the Court's ruling that plaintiffs have stated claims under § 1983, the Court need not resolve the analytically distinct issue of whether the statutes and regulations on which plaintiffs rely can support private rights of action independent of § 1983. *See generally Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). *Compare Fay v. South Colonie Central Sch. Dist.,* 802 F.2d 21 (2d Cir.1986) (finding viable § 1983 claim but no private right of action) *with Haskins v. Stanton,* 794 F.2d 1273 (7th Cir.1986) (recognizing private right of action for violation of Food Stamp Act); *and Moore v. Perales,* 692 F.Supp. 137 (E.D.N.Y.1988) (same).

6. The City defendants have not cross-moved to dismiss plaintiffs' claims against them.

7. At the close of the hearing, plaintiffs' counsel conceded that preliminary injunctive relief directed at the State defendants may be premature. (*See* Hr'g Tr. 658–59.)

8. Nonetheless, the Court observes that official-capacity actions seeking prospective injunctive relief for alleged violations of federal law are not treated as actions against the State. *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Kostok v. Thomas,* 105 F.3d 65, 68–69 (2d Cir.1997); *Mont v. Heintz,* 849 F.2d 704, 709–10 (2d Cir.1988).

which impose unambiguous obligations on participating State agencies. *See* 7 U.S.C. § 2020(e)(2)(B) ("a State agency—(i) shall provide timely, accurate, and fair service to applicants for, and participants in, the food stamp program; (ii) shall develop an application containing the information necessary to comply with this chapter; (iii) shall permit an applicant household to apply to participate in the program on the same day that the household first contacts a food stamp office in person during office hours; (iv) shall consider an application that contains the name, address, and signature of the applicant to be filed on the date the applicant submits the application ..."); 7 U.S.C. § 2020(e)(3) ("the State agency shall thereafter promptly determine the eligibility of each applicant household so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application ..."); 7 U.S.C. § 2020(e)(9) ("the State agency shall—(A) provide coupons no later than 7 days after the date of application to any [eligible] household ...") Courts have held similar provisions of the Food Stamp Act enforceable under § 1983. *See Gonzalez v. Pingree,* 821 F.2d 1526, 1528 (11th Cir. 1987); *Victorian v. Miller,* 813 F.2d 718 (5th Cir.1987) (*en banc*); *see also Robidoux v. Celani,* 987 F.2d 931 (2d Cir.1993) (reinstating § 1983 claims alleging unlawful delay in processing of food stamps application and determining eligibility).

■ Although the issue is novel in this circuit, it is equally clear that plaintiffs have a federal right to "reasonably prompt[ ]" Medicaid assistance under 42 U.S.C. § 1396a(a)(8). Other courts have held that § 1396a(a)(8) creates a statutory right that may be enforced pursuant to 42 U.S.C. § 1983. *See Doe v. Chiles,* 136 F.3d 709 (11th Cir.1998); *Sobky v. Smoley,* 855 F.Supp. 1123, 1146–47 (E.D.Cal.1994); *Wellington v. District of Columbia,* 851 F.Supp. 1, 5 (D.D.C.1994); *compare Graus v. Kaladjian,* 2 F.Supp.2d 540, 543 (S.D.N.Y.1998) (no enforceable § 1983 rights are created by § 1396a(a)(1), § 1396a(a)(5), 42 C.F.R.

§ 435.930(b) or § 431.10—"Not every rule creates a right ... § 1983 does not authorize indiscriminate private enforcement of the vast universe of federal regulations but extends such enforcement only to those regulations that further define the substance of a statutory (or constitutional) provision that itself creates an enforceable right.").

■ Plaintiffs also have an overarching property interest in their continued receipt of food stamps, Medicaid and cash assistance. *See Goldberg,* 397 U.S. at 261–66, 90 S.Ct. at 1016–20; *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970); *Morel,* 927 F.Supp. at 631–32. Plaintiffs' allegations concerning various practices at job centers, such as providing false or misleading information to applicants about their eligibility, arbitrarily denying benefits to eligible individuals, and failing to provide notice of hearing rights, state a viable due process claim under § 1983.[9]

■ Turning to the facts, plaintiffs have also met their burden of establishing a likelihood of success on these claims. On March 31, 1998, the City opened its first job center as a test bed so that City officials could make ongoing modifications and expand the program incrementally. (Hr'g Tr. 386–87.) As Jason Turner, New York City's Human Resources Administration's Commissioner, observed: "[W]e didn't do lengthy planning followed by implementation, instead, we acted first and worried about the consequences later. And that seems to have worked for us." (Hr'g Tr. 387.) Commissioner Turner acknowledged that errors are inevitable and added that the benefit of proceeding incrementally is the avoidance of "rolling out a major mistake on a city-wide basis." (Hr'g Tr. 388.)

The evidence presented by plaintiffs in their motion for preliminary relief, as well as the candid assessments of certain City officials, including Commissioner Turner and other high-ranking HRA deputies, demonstrates that additional self-study is necessary to ensure that the City's vision of job centers

---

9. Exhaustion of state administrative remedies is unnecessary. *See Wilbur v. Harris,* 53 F.3d 542, 544 (2d Cir.1995); *Jose P. v. Ambach,* 669 F.2d 865 (2d Cir.1982).

as a "beautiful system of engagement" and the enthusiasm of HRA employees for workfare do not obscure the underlying statutory requirement to protect the health and well-being of the neediest households in the population. (Hr'g Tr. 392.)

To the extent that the City has learned from its mistakes in rolling out job centers, the efforts to correct them and modify procedures appear to have been *ad hoc*. Indeed, the City first offered a host of revised procedures, policy directives and application forms only after the evidentiary hearing commenced. (*See* Defs.' Exhibit D.) According to the testimony, the majority of those revised documents were created just days before the hearing. (Hr'g Tr. 281.) Moreover, those proposed policy changes continue to be subject to review by counsel and outside agencies charged with regulatory oversight of the food stamp, Medicaid and cash assistance programs in New York City. They could fairly be characterized as a work-in-progress.

There is no question that this litigation focused the City's attention on problems in the day-to-day operations of the job centers. This Court is impressed by the conscientiousness of Commissioner Turner and his deputies in their efforts to modify policies and procedures in the job centers. There is considerable reason to be optimistic about the transition from income support centers to job centers given that staff there seem to be open to reform and are particularly enthusiastic about helping applicants find jobs. (Pls.' Ex. 30 at iv.)

The City of New York is entitled to implement a policy that promotes work and self-reliance rather than dependency. In its quest to enhance the delivery of food stamps, Medicaid and cash assistance benefits to the City's most needy residents, the City cannot lose sight of the requirements imposed by federal statutes and regulations. Because some of the City's neediest residents continue to fall through the safety net at job centers, this Court is impelled to ensure that remedial steps are taken on a specified timeline and that the effects of the revisions to job center procedures are measured to ascertain whether they are working.

As already stated, the conversion of income support centers to job centers began with the Greenwood Job Center on March 31, 1998. That center was selected to start the conversions because of the professional staff employed there. The staff at Greenwood had been specifically recruited because of their strong interest in "moving families to self-sufficiency" by helping them find jobs. (Hr'g Tr. at 271.) Following a three-week trial run in Greenwood, the City converted its income support center in Jamaica to a job center on April 20. Two more income support centers were converted on July 1, 1998, Queens and Richmond. During the balance of 1998, nine additional income support centers were converted as follows: August 31, Hamilton, Dyckman and Bushwick; November 16, Tremont and Crotona; November 30, Bay Ridge; and December 14, East Harlem, Concourse and Linden/Prospect. In addition, on August 31, 1998, the Yorkville Job Center was opened. (*See* Stipulated Facts ¶¶ 14 and 15.)

Originally, the City planned to convert the DeKalb and Brownsville income support centers to job centers during the week of January 4, 1999. However, the City agreed to delay those conversions in order to accommodate the parties' desire to adjourn the preliminary injunction hearing. At trial, Commissioner Turner conceded that delays in the construction schedule made it impossible to convert those job centers prior to January 25, 1999. The parties have stipulated that the City intends to convert its remaining income support centers to job centers no earlier than the following dates:

| January 25, 1999 | — DeKalb |
| February 1, 1999 | — Brownsville |
| February 8, 1999 | — Bergen/Willis |
| February 16, 1999 | — Waverly |
| March 1, 1999 | — Fulton and Clinton |
| March 8, 1999 | — Fordham |
| March 15, 1999 | — St. Nicholas |
| March 29, 1999 | — Euclid |
| April 2, 1999 | — Kingsbridge/Melrose |
| April 5, 1999 | — Rider |
| April 10, 1999 | — Queensboro |
| April 26, 1999 | — East End |

In addition, the City intends to open the Riverview Job Center no earlier than March 15, 1999. Commissioner Turner acknowledged that the schedule could be delayed for several weeks without any harm to the City. (Hr'g Tr. at 428.) In addition, the retraining of staff will take approximately two to three weeks. (Hr'g Tr. at 417.) At the hearing, the most pressing concern identified by Commissioner Turner was interference with the construction schedule for the physical conversion of income support centers to job centers. (Hr'g Tr. at 427, 431.)

*Effects of the Conversions*

Some of the data proffered by the plaintiffs suggests that after an income support center is converted to a job center, fewer applicants are approved for benefits. (Lee Decl. ¶ 4.) For example, during the first four weeks of the operation of the Jamaica Job Center, 84% of the individuals seeking assistance were turned away without having filed an application for assistance. (Lee Decl. ¶ 5.) Based on the data presented at the hearing, a monthly average of 48.96% of all applicants were diverted from seeking assistance at the Jamaica Job Center. (*See* Pls.' Ex. 54.) At the Greenwood Job Center, over 69% of the individuals seeking assistance left the center without filing an application. (Lee Decl. ¶ 6.) Furthermore, a study revealed that twenty-three percent and seventeen percent of the financial planners at the Jamaica and Greenwood Job Center respectively were actively attempting to discourage individuals from applying for assistance. (Pls.' Ex. 30 at 11.) At the Jamaica Job Center, a staff member expressed concern that some financial planners were taking two to three hours to convince applicants to withdraw their applications. (Pls.' Ex 30 at 12.) Staff at the Greenwood and Jamaica Job Centers expressed the view that "while higher-ups said "Work First,", they meant "Diversion First."" (Pls.' Ex. 30 at 13.) "Overwhelmingly, job center staff thought that the goal of welfare reform was diversion." *Id.*

The numbers were slightly lower at more recently converted centers. For example,

the percentage of applicants diverted at the Tremont Job Center, which opened on November 16, 1998, was 34% the week of December 4, 1998, 31.6% the week of December 11, 1998, and 20.4% the week of December 18, 1998. (Pls.' Ex. 48.) Similarly, at the Crotona Job Center, which opened on November 16, 1998, 22% of applicants were diverted from November 20 to December 18, 1998. (Pls.' Ex. 49.) Moreover, only 50% of individuals seeking assistance at the Crotona Job Center were seen by a financial planner. (Pls.' Ex. 49.) Each week, between one-third and one-half of applicants seeking assistance at various job centers were diverted by the time they reached the financial planner. (*See* Pls.' Exs. 42–52.) The numbers at other job centers, such as Dyckman and Queens are even higher; the percentage of applicants diverted is more than fifty percent. (*See* Pls.' Ex. 43, 45.)

However, since conversion, the percentage of individuals who seek assistance but are not seen by a financial planner has increased. (Lee Reply Decl. ¶ 89.) The financial planner is crucial in the application process because it is the financial planner who determines if emergency needs requiring immediate attention are present. Most of the applicants seeking assistance were seen by financial planners at the Jamaica, Yorkville, Queens, and Greenwood Job Centers. However, at the Dyckman, Bayridge, Crotona, Hamilton, Bushwick, and Linden/Prospect Job Centers, the percentage of applicants who were not seen by a financial planner ranged from 25% to 60%. (*See* Pls.' Ex. 42–53.) Without a financial planner interview, the agency is unable to immediately screen an applicant's PJP to determine if emergency needs are present.[10]

The data further reveals that the number of pre-investigation emergency cash grants also declined in the wake of the conversion of income support centers to job centers. For example, while there were 51 immediate needs grants in the month before the conversation of the Greenwood Center, six months later there were only 36. Similarly, immedi-

---

10. The percentage of applicants seen by a financial planner at the Dyckman, Bayridge, Crotona, Hamilton, Bushwick, and Linden/Prospect Centers were approximately 74%, 60%, 45%, 54%, 70%, 49% respectively.

ate needs grants at the Queens Center fell from 43 in the month prior to conversion to 24 two months after conversion. At the Bushwick Center, immediate needs grants fell from 123 to 81, only one month after conversion. (Pls.' Ex. 80.) When these numbers are calculated as a percentage of the persons applying for cash assistance, the numbers show a significant decline. For example, the percentage of applicants who received immediate needs grants fell from 13.3% before conversion to 8.8% one month after conversion in the Greenwood Center; from 12% to 5.3% in the Hamilton Center; 7.3% to 3.3% in the Queens Center; and 37.9% to 13.3% in the Bushwick Center. (Reply Decl. Lee ¶¶ 60–65, 114.)

There also appears to be a correlation between the conversion of income support centers to job centers and a decline in the number of applicants who receive expedited food stamps. At the Richmond Center, there was a 50% decline in the number of persons granted expedited food stamps after conversion to a job center. The statistics from other job centers reveal a similar pattern and are unexplained: Prior to conversion, 40.2% of applicants at Greenwood received expedited food stamps, while post-conversion the percentage dropped to 16%; at Hamilton, the percentages plummeted from 10.7% to 1.3%; at Queens, from 9.6% to 2.4%; and at Bushwick, from 42.4% to 16.7%. (Lee Decl. ¶¶ 60–65.)

*Emergency Assistance*

Evidence at the hearing and plaintiffs' declarations indicate that individuals with emergency needs often go without immediate assistance. The plaintiffs describe a number of incidents where applicants for expedited food stamps or emergency cash assistance are referred by job center personnel to food pantries or soup kitchens. (Morgan Decl. ¶ 21–23; Stalzer Decl. ¶ 14.) Defendants claim that they only refer applicants seeking emergency assistance to food pantries to tide them over until their application for emergency assistance has been processed. However, when viewed in conjunction with the fact that plaintiffs are often not receiving expedited food stamps or pre-investigation cash grants within the seven day period mandated by statute, *see* 7 U.S.C. § 2020(e)(9), the evidence indicates that referrals to pantries are being used as a replacement for these expedited benefits. Carlos Rodriguez, an employee of the Tremont Community Council, observed at the hearing that the food pantry he supervises was overwhelmed by individuals seeking food with vouchers and/or referrals following the conversion of the Tremont income support center to a job center. (Hr'g Tr. 79–81.) The Tremont Community Center has been forced to curtail the number of days it operates because demand far exceeds supply. (Hr'g Tr. 81–82, 86.)

The evidence presented at the hearing reveals that the training materials provided to financial planners as part of the conversion process do not describe the procedure for processing expedited foods stamps or emergency cash assistance. In fact, the "Job Center Work Flow Guide," which is among the training materials provided to financial planners, does not even mention the title of the form for expedited food stamps. (Pls.' Ex. 85, 86, 87.) Additionally, the training materials do not outline the obligation of job center staff to inform applicants that their application will be processed as long as it contains their name, address, and signature. Under 7 C.F.R. § 273.2, the "household shall be advised that it does not have to be interviewed before filing the application and may file an incomplete application form as long as the form contains the applicant's name and address, and is signed by a responsible member of the household or the household's authorized representative." It appears that job center staff fail to convey this information to applicants.

Job center dispositions reflect the City's efforts to document what is occurring at the job centers, particularly why individuals seeking assistance are leaving without completing an application. (Hr'g Tr. at 236.) These weekly charts indicate that some individuals seeking assistance were turned away because their spouse was not present at the time of their application. (Pls.' Ex. 57 Bates Stamped 588; Lee Reply Decl. ¶ 81, 93 at 2.) In addition, some job center staff are also preventing individuals under the age of 21

from applying for assistance. (Pls.' Ex. 57; Stalzer Decl. ¶ 19; Williams–Kuhn Decl. ¶ 11.)

Plaintiffs' documentary evidence reveals that applicants with emergency needs are not being provided with expedited foods stamps within the seven day period imposed by federal law. (Reynolds Decl. ¶ 9; Smiley Decl. ¶¶ 14, 15, 19, 21; Landea Decl. ¶ 16; Cuevas Decl. ¶¶ 15–17; Calabrese Decl. ¶ 12; Coram Decl. ¶ 6; Perez Decl ¶ 8). At the hearing, City defendants stipulated that plaintiffs Lue Garlick, Adriana Calabrese, Elston Richards, and Georgina Bonilla indicated on their PJPs that they faced a food, shelter or utility emergency. (Hr'g Tr. 585.) Ms. Garlick requested emergency relief on November 23, 1998 when she completed the PJP. However, her application was not processed for expedited food stamps because she did not request an expedited food stamps interview on her "Information About an Expedited Food Stamp Interview" form. (Flaum Decl. ¶ 36.) Ms. Garlick did not discover that her application had been rejected until December 8, 1998, when she called the center. (Garlick Decl. ¶ 25.) Ms. Calabrese requested emergency relief on October 26, 1998, but on November 2, 1998 her application was denied because she failed to report for her "I" interview. (Flaum Decl. ¶ 99.) Ms. Calabrese requested emergency relief again on November 13, 1998 but this application was also denied because she had failed to report for her EVR interview in connection with her prior application. (Flaum Decl. ¶ 104.) Mr. Richards requested emergency relief on his PJP on December 1, 1998. In addition, he also requested an expedited food stamp interview. (Flaum Decl. ¶ 61.) However, he did not receive an appointment for an "I" interview until December 7, 1998. *Id.* Moreover, as of December 15, Mr. Richards had not received any expedited food stamps. Ms. Bonilla requested emergency relief on November 19, 1998 when she completed her PJP. However, because she did not request an interview on her "Information About an Expedited Food Stamp Interview" form, her application was not processed for expedited food stamps. (Flaum Decl. ¶ 22.)

Plaintiffs introduced evidence that applicants who arrive later in the day are told that they must return another weekday morning, regardless of their emergency needs. (Lee Decl. ¶ 17; Richard Decl ¶ 10; Morgan Decl. ¶ 9; Perez Decl. ¶ 5.) For example, at the Jamaica Job Center, "most people who come after 11:00 a.m. cannot be seen that day and are told to come back the next day." (Pls.' Ex. 30 at ii, 15–16.) Moreover, a study of the Greenwood Job Center found that the applicants that were turned away had their application logged in not on the day they came to the job center, but on the next business day. (Pls.' Ex. 30 at ii, 16). Further, HRA's Executive Deputy Commissioner, Patricia Smith conceded that she was "surprise[d]", (Hr'g Tr. at 240), and "outrage[d]", (Smith Dep. at 175) when her audit team reported to her in December 1998 that applicants arriving at mid-day were turned away. (Hr'g Tr. 241–42.) The application logs disclosed that the last applicant for the day was routinely recorded as arriving at noon, and none were found later than 12:30 p.m. (Hr'g Tr. at 242, 244.)

The screening instrument currently in use at the job centers to assess emergency needs is the "Information About an Expedited Food Stamp Interview" form. (Pls.' Ex. 28.) Often times, this form was not used on the date the applicant first contacted a job center. (Pls.' Ex. 33 at 12.) Furthermore, many applicants are apparently confused by this form because it does not contain any place for them to check off enumerated criteria. (Lee Reply Decl. ¶ 47.) Consequently, many applicants fail to check off the box requesting an immediate expedited foods stamp interview, even though they told the financial planner that they did not have any food or money to buy food or that they were homeless as defined by the form. (Flaum Decl. ¶¶ 7–8, Smiley Decl. ¶ 14, 21; Reynolds Decl. ¶ 9.) However, 7 C.F.R. § 273.2(i)(2) requires the State agency to identify individuals eligible for expedited service at the time the individual requests assistance. The current language and format of the "Information About an Expedited Food Stamp Interview" form allows many otherwise eligible applicants for expedited food stamps to fall

through the cracks and not receive these essential benefits.

*Missing Appointments*

The job center application process requires applicants to report to the center or at other appointments on every weekday of the 35 to 50 day application period. There is evidence to suggest that applicants are informed that if they miss even one day, they must start again at the beginning of the process. (Garlick Decl. ¶ 15; Smiley Decl. ¶ 20; Morgan Decl. ¶ 15–19; Williams–Kahn Decl. ¶ 15; King Decl. ¶ 7 (describing process at Linden Job Center); Cox Decl. ¶ 15 (describing process at Richmond Job Center); Hr'g Tr. 468.)

While City managerial staff asserted that eligibility for food stamps and Medicaid was not tied to eligibility for cash assistance with its attendant employment requirements, the evidence shows that they are frequently bundled together. At the hearing, the City offered Sylvia Gonzalez, a financial planner from the Linden Job Center, to describe her role in the application process. On cross-examination, Ms. Gonzalez conceded that if she received notice from an employment planner that an applicant had missed an appointment, she would "reject the case." (Hr'g Tr. 468.) The following colloquy ensued:

Q. Reject the case. Which case would you reject? Would their public assistance case be rejected?

A. The whole case. It's a package deal.

Q. Would their food stamp case be rejected?

A. Yes.

Q. Would their Medicaid application be rejected?

A. Yes.

(Hr'g Tr. at 468.) This exchange underscores the need for clear instructions to financial planners and employment planners at job centers concerning eligibility for food stamps and Medicaid.

*Notice*

Several plaintiffs did not receive notice of the denial of their applications for food stamps, Medicaid, and cash assistance. (Smiley Decl. ¶ 25.) The evidence adduced at the hearing reveals that many applicants are unable to avail themselves of their right to a hearing because many applications are denied without written notice to the applicant explaining the basis for that denial.

This Court is persuaded that the practices at a number of job centers result in the denial of applications without providing applicants with written notice of the reasons for that denial or informing the applicant of his or her right to request a fair hearing. *See* 7 C.F.R. § 273.2(c)(6); (Calabrese Decl. ¶ 13; Smiley Decl. ¶¶ 15–17; Richards Decl. ¶ 9.) City defendants acknowledge that if a financial planner reviews the PJP and the Form 2921 and determines that the applicant is ineligible, he informs the applicant orally and does not issue a written notice. (Thomas Dep. at 27–128, 130). In fact, timely notice usually is not given until the conclusion of the "I" interview, which typically occurs five to seven days after the application date. (Smith Decl. ¶¶ 14, 42.) Under the job center system, a failure to meet any one of a number of obligations during the application process can result in a denial of the applicant's entire public assistance package. When the application is rejected before the "I" interview is conducted, ordinarily no written notice is provided.

*Invalid Denials*

The record also discloses that job center staff denied food stamps and Medicaid applications for failure to submit certain forms and failure to comply with work rules. (Diamond Decl. ¶ 6) (describing practices at Hamilton Job Center). For example, at the hearing, Ms. Judith Bernstein, team leader for the New York City Region from the New York State Office of Temporary and Disability Assistance, agreed that the City has had continuing problems in accurately assessing food stamp eligibility. (Hr'g Tr. at 107–08.) In addition, Sue Kelly, Associate Regional Administrator at the federal Health Care Financing Administration ("HCFA"), expressed that her agency was concerned that many "eligible low-income children and adults were being exposed to additional bar-

riers when applying for Medicaid." (Hr'g Tr. 354; Pls.' Ex. 41.)

Of the six named plaintiffs whose case reports were submitted to the Court, five of those applications were denied because the applicant failed to report to a subsequent interview or simply failed to submit additional forms. (Flaum Decl. ¶ 16 (failure to submit childcare form), ¶ 46 (failure to submit additional documents to establish eligibility), ¶ 55 (failure to report for appointment interview), ¶ 78 (failure to report for orientation), ¶ 115 (failure to submit documentation that applicant had applied for unemployment benefits); Satterwhite Decl. ¶ 9.) In fact, some applicants are informed that every appointment is mandatory and that failure to keep an appointment will result in the denial of their application. They are further instructed that if a single day of job search is skipped, the entire process must be started all over again from the beginning. (Lee Decl. ¶¶ 38–41; Richards Decl. ¶¶ 3, 12; Stevens Decl. ¶ 10; Morgan Decl. ¶ 15; Burch Decl. ¶ 3–4; Stalzer Decl. ¶ 13; Kahn Decl. ¶ 15; King Decl. ¶ 7; Cox Decl. ¶ 15; Hr'g Tr. 468).

The evidence shows that applicants miss appointments through no fault of their own. For example, financial planners have neglected to mark important appointments like the "I" interview on calenders given to applicants because it was confusing the employment planners. Consequently, many applicants reported to Fed Cap, missing their "I" interviews, and being terminated as "Failure to Report" even though they were actively participating in the program. (Pls.' Ex. 30 at iii, 23.) Other examples include circumstances where the applicant was terminated when he or she was actually actively participating in job interviews or otherwise involved in the job center process. (Pls.' Ex. 30 at 23.)

## CONCLUSION

■ PRWORA represents a legislative sea change in thinking about welfare. Reforming welfare in a large city such as New York presents tremendous challenges. The City embarked on an ambitious plan to implement PRWORA and exercise its managerial prerogatives to redirect the needy from welfare to workfare. Despite this legitimate goal, this Court cannot ignore the evidence presented by plaintiffs concerning individuals whose urgent needs were overlooked by the City in the wake of this transition. The City defendants argue that these problems were isolated incidents that occurred at a few job centers, and are not indicative of a systemic violation. (Diamond Decl. ¶ 3.) At this stage of the litigation, this Court cannot agree.

While the City defendants have offered evidence that they are in the process of addressing some of the issues raised by plaintiffs' motion, this Court finds that the plaintiffs and other applicants for food stamps, Medicaid and cash assistance will suffer irreparable harm if preliminary injunctive relief is not entered now. Accordingly, pursuant to Rule 65, the Court directs the following preliminary relief pending a further hearing in this matter:

1. The "informal intervention" process ordered by this Court on December 23, 1998 shall continue to be utilized to address individual cases of exigent need for expedited food stamps and/or emergency cash assistance; and

2. The City defendants are directed to allow plaintiffs and all persons applying for food stamps, Medicaid and cash assistance, including expedited food stamps and temporary pre-investigation grants to apply for such benefits on the first day that they visit a Job Center; and

3. The City defendants are directed to process all applications for expedited food stamps and temporary pre-investigation grants at Job Centers within the time frames required by law; and

4. The City defendants are directed to make eligibility determinations regarding food stamps and Medicaid applications at Job Centers separate from the eligibility determinations regarding cash assistance applications; and

5. The City defendants are directed to send plaintiffs and all persons applying for food stamps, Medicaid and cash assistance, including expedited food stamps and temporary pre-investigation grants at Job Centers timely and ade-

quate written notice of determinations of their eligibility for all benefits which they seek; and

6. The City defendants are preliminarily enjoined from converting any Income Support Centers to Job Centers or opening any new Job Centers pending a hearing and determination on the adequacy of a corrective plan of training and procedures for all HRA personnel at existing Job Centers and at Income Support Centers scheduled for conversion to Job Centers who have contact with applicants for food stamps, Medicaid or cash assistance. The corrective plan of training and procedures shall address, *inter alia:*

 a. Procedures to permit applicants to file an application for food stamps, Medicaid or cash assistance on the first day of contact with a Job Center.

 b. Procedures for separate determinations on an applicant's request for food stamps, Medicaid and cash assistance.

 c. Procedures for processing applications for expedited food stamps within seven days from the date the application is submitted.

 d. Procedures for processing applications for pre-investigation immediate needs cash assistance in a manner consistent with State law.

 e. Procedures for processing applications for food stamps and/or Medicaid where applicants fail to comply with work requirements.

 f. Procedures for providing written notice to applicants denied food stamps, Medicaid and/or cash assistance together with the basis for those denials and an opportunity to request a fair hearing.

 This decretal paragraph 6 shall not enjoin the City defendants from continuing construction necessary to prepare existing income support centers for conversion to job centers.

7. The City defendants are directed to serve and file a corrective plan together with all curricula and materials to be utilized in the retraining of personnel and revised forms and policy directives with this Court no later than February 10, 1999. Any comments on the adequacy and appropriateness of the corrective plan shall be filed with this Court no later than five business days after service of the City's plan.

The Court will hear oral argument on the sufficiency of the corrective plan as soon as practicable after the submissions have been filed. At that time, the Court will also entertain any requests to modify the preliminary injunction.

Finally, the parties are directed to confer on the formulation of a pretrial discovery plan pursuant to FED.R.CIV.P. 16 to be presented for approval to this Court on February 18, 1999.

SO ORDERED.