Elaine OLSON, Plaintiff,

v.

**Brian J. WING, as Commissioner of the Office of Temporary and Disability Assistance of the New York State Department of Family Assistance, Antonia C. Novello, M.D., as Commissioner of the New York State Department of Health, and Verna Eggleston, as Commissioner of the New York City Department of Social Services, Defendants.**

**No. 02 CV 5873 NG (CLP).**

United States District Court,
E.D. New York.

Feb. 14, 2003.

Roy A. Esnard, Attorney General of the State of New York, Jane R. Goldberg, Corporation Counsel of the City of NY, New York, NY, for Defendant.

Peter Vollmer, Law Offices of Vollmer & Tanck, L.L.P., Jericho, NY, for Plaintiff.

## PRELIMINARY INJUNCTION

GERSHON, District Judge.

In accord with the Opinion and Order issued by this court on February 14, 2003, defendants are ordered to provide notice to all Disaster Relief Medicaid recipients who, from this date forward, are issued Notices of Decision terminating their benefits of their right to a fair hearing and to aid-continuing during the pendency of that hearing. It is further ordered that aid-continuing be provided to those recipients who, having received such notice, from this date forward, timely request a fair hearing.

**SO ORDERED.**

## OPINION AND ORDER

In the wake of the September 11, 2001 attack on the World Trade Center and the accompanying destruction of the State of New York's Medicaid computer system, the City and State undertook efforts to ensure that New York City residents who were eligible for Medicaid were provided with necessary medical assistance even though the State was unable to process any new applications or re-certifications at that time. Plaintiff Elaine Olson brings this class action on behalf of herself and all Disaster Relief Medicaid ("DRM") recipients whose benefits have been terminated but who have not received notice of, or the right to, continuation of benefits during the pendency of a fair hearing ("aid-continuing"), as they would have had they been recipients of traditional Medicaid. Plaintiff's complaint alleges violations of the Due Process and Equal Protection Clauses of the United States Constitution and disability discrimination in violation of 29 U.S.C. § 794(a).

Now before the court is plaintiff's motion for preliminary injunction to enjoin defendants Brian Wing, Commissioner of the Office of Temporary and Disability Assistance of the New York State Department of Family Assistance and Antonia C. Novello, M.D., Commissioner of the New York State Department of Health (collectively, "state defendants"), and Verna Eggleston, Commissioner of the New York City Department of Social Services ("city defendant"), from terminating the Medicaid benefits of DRM recipients who, from this date forward, receive Notices of Decision terminating their benefits and who timely request a fair hearing to appeal that termination until such time as a fair hearing decision is issued. Plaintiff also seeks an Order directing defendants to notify all DRM recipients who, from this date forward, are issued Notices of Decision terminating their benefits of their right to a fair hearing and to aid-continuing pending a fair hearing decision. Finally, plaintiff seeks an Order directing defendants to provide aid-continuing to all DRM recipients who have timely requested, or in the future timely request, a fair hearing but have not yet been issued a fair hearing decision.[1] Thus plaintiff's motion is prospective in nature and, as defendants acknowledge, affects only a limited group of DRM recipients. Plaintiff's motion is brought solely on Due Process grounds.

Defendants oppose plaintiff's motion on the grounds that: (1) plaintiff has now been determined eligible for Medicaid and is currently receiving benefits, thereby mooting the action; and (2) plaintiff has not established that an injunction is necessary. Defendants further argue that DRM recipients are not traditional Medic-

---

1. Insofar as the proposed order submitted by plaintiff's counsel seems to request non-prospective relief, it is inconsistent with his previous representations before this court. Plaintiff's request for such relief therefore will not be considered at this time.

aid recipients and therefore are not entitled to aid-continuing.

## Statement of Facts

The parties agree that there are no disputed issues of fact which are material to the motion before the court.

Medicaid is a cooperative federal-state program implemented pursuant to 42 U.S.C. §§ 1396 *et seq.* Participating states must comply with the requirements of the Medicaid Act and implementing regulations promulgated by the United States Department of Health and Human Services ("HHS"). New York State's Department of Health is the single state agency charged with submitting New York's Medicaid State Plan to HHS, establishing eligibility standards, promulgating regulations to carry out the Medicaid program, maintaining a system for administrative fair hearings and issuing final decisions in administrative appeals. New York State's Office of Temporary and Disability Assistance supervises the administration of the Medicaid program through local social service districts. City defendant is the Commissioner of one such local social service district.

Applicants for traditional Medicaid must complete an application and attend an in-person interview in order to prove their eligibility for benefits. If a new applicant is determined ineligible for benefits, a Notice of Decision is issued informing the applicant of the agency's determination and the applicant's right to request a fair hearing contesting that determination. New applicants for Medicaid are not entitled to any benefits during the time in which their fair hearings are pending. Under the State's "look-back" provision, however, an applicant who is determined eligible for Medicaid as a result of a fair hearing is entitled to retroactive benefits for the three months preceding the date of his or her original application. 42 U.S.C. § 1396(a); 42 C.F.R. 435.914; 18 N.Y.C.R.R. § 360–6.2(c).

Traditional Medicaid recipients must undergo a re-certification process to determine their continued eligibility for Medicaid every 12 months. These recipients need not initiate the re-certification process; rather, a notice is sent to the recipient's home informing the recipient of the scheduled date of the re-certification interview. If a recipient fails to attend or reschedule that re-certification interview, the recipient is issued a Notice of Decision which informs him or her of the date on which benefits will be terminated pursuant to the terms set forth in 42 C.F.R. § 431.211 and 18 N.Y.C.R.R. § 358–2.2. That Notice of Decision also informs recipients of their right to request a fair hearing to contest the termination of benefits pursuant to 42 C.F.R. § 431.220 and 18 N.Y.C.R.R. 358–2.2(a)(5)-(8) and the right to continued benefits during the pendency of a timely-requested fair hearing pursuant to 42 C.F.R. §§ 431.205, 431.230 and 18 N.Y.C.R.R. § 358–3.6. The regulations just cited also apply to a recipient who has completed the re-certification process and is deemed ineligible for continued benefits.

On September 11, 2001, state defendants' Medicaid computer system was damaged as a result of the terrorist attacks on the World Trade Center. As a result, city defendant had no access to computerized Medicaid records for the processing of re-certifications of persons currently receiving Medicaid or the processing of new applications for benefits. State defendants, in conjunction with various city and federal officials, thereafter implemented the DRM program. In accordance with agreements reached among these officials, DRM waived the usual verification procedures for determining Medicaid eligibility and replaced them with a simplified, one page Medicaid application

and minimal verification requirements. Applicants for DRM received a same-day Medicaid eligibility determination and, if approved, Temporary Medicaid Authorization for a four month period. 343,740 individuals in 253, 636 New York City households received such authorizations through the DRM program.

In order to process the large number of persons granted DRM without interruption in coverage, defendants continued full Medicaid coverage for all newly-approved DRM recipients for up to a full year following the expiration of the four month Temporary Medicaid Authorization. DRM recipients were issued Medicaid cards and were scheduled for face-to-face interviews to complete a traditional Medicaid application and to determine their eligibility for Medicaid under the more rigorous processing requirements imposed by federal law.[2] DRM recipients who kept their face-to-face interviews were granted continued benefits until an eligibility determination was made. If they were determined to be ineligible, they were notified of their right to request a fair hearing, but were not advised of, nor granted, a right to aid-continuing while a fair hearing decision was pending. DRM recipients who did not keep their face-to-face meeting received a termination notice within 10 days of their missed appointment which notified them of the right to request a fair hearing. These DRM recipients also were denied aid-continuing while their fair hearing decisions were pending.

On September 16, 2002, the federal government tentatively approved DRM and related transition programs as "presumptive eligibility" demonstration projects under 42 U.S.C. § 1315. The terms of the federal government's waiver of normal processing requirements for Medicaid relief, as well as the parameters of DRM coverage, received final federal government approval on December 31, 2002. Presumptive eligibility programs generally provide "time-limited coverage to persons who have not applied for Medicaid but who, on the basis of preliminary information, appear likely to be found eligible if they were to apply." Affidavit of S. Lezama–Ramirez at 7. New York State regulations specifically provide that there is no right to aid-continuing for presumptively eligible Medicaid recipients who have subsequently been denied eligibility. 18 N.Y.C.R.R. § 358–3.6(a)(2)(iii). The demonstration project approved by the federal government for DRM, however, applied both to first-time applicants for Medicaid and persons already receiving Medicaid whose annual re-certifications were scheduled between September 11, 2001 and January 31, 2002.

It is undisputed that a substantial number of DRM recipients who have been scheduled for face-to-face interviews have not kept their original appointments, resulting in termination of their benefits. Defendants have not yet been able to identify what portion of those DRM recipients whose benefits have been terminated have subsequently requested a fair hearing. Of the original 343,743 DRM recipients, approximately 275,000 have received notice of a face-to-face interview date. As of December 10, 2002 state defendants had identified 46 former DRM recipients who were denied coverage for failure to appear for their face-to-face interviews, subsequently timely requested fair hearings, and have not been granted aid-continuing

---

**2.** Defendants have made representations, which plaintiff does not dispute, that separate provisions for re-certification were made for those DRM recipients who were receiving traditional Medicaid prior to September 11, 2001 and were placed on DRM solely because their re-certification interviews were scheduled between September 11, 2001 and January 31, 2002. Those individuals are not the subject of this action.

during the pendency of those hearings. This number does not include former DRM recipients who were denied coverage following a face-to-face interview and who have subsequently requested a fair hearing.

Named plaintiff Elaine Olson is a 58 year old widow who suffers from breast cancer, a chronic kidney disorder, depression, anxiety and panic attacks. On January 31, 2002, Ms. Olson signed a completed DRM application which was submitted to city defendant on her behalf by her neighbor, Eugene Doyle, a certified social worker. On that same day, Ms. Olson was approved for DRM and was issued Temporary Medicaid Authorization entitling her to Medicaid benefits until April 30, 2002. By letter dated April 17, 2002, city defendant informed Ms. Olson that they were "temporarily extending" her DRM coverage to allow her "to complete the Medicaid/Family Health Plus application process." That letter stated that "you do not need to take any action at this time to continue your health coverage ... In the next several weeks, you will receive letters that will tell you ... how and when to apply for Medicaid/Family Health Plus." Ms. Olson thereafter received a Medicaid card in the mail.

By notice dated August 19, 2002, city defendant informed Ms. Olson that "in order to continue to get health care coverage," she was required to complete an application for Medicaid/Family Health Plus and attend a face-to-face interview on October 15, 2002 at city defendant's Long Island City office. The notice also informed Ms. Olson of her right to request a home interview and stated that if she wished to change her appointment date or time she should call the city's automated number "no earlier than 2 weeks before" the scheduled appointment date. City records indicate that Ms. Olson requested a home visit on August 30, 2002. On Octo-

ber 15, 2002, Mr. Doyle called city defendant's automated number to request the rescheduling of Ms. Olson's face-to-face interview and to reiterate her request for a home visit. That interview was not rescheduled. By a Notice of Decision issued on October 25, 2002, city defendant informed Ms. Olson that her health coverage under DRM would be terminated as of November 7, 2002. The Notice also informed Ms. Olson that she could appear for a face-to-face interview at the Medical Assistance Program's 34th Street Manhattan office to apply for Medicaid/Family Health Plus on any date prior to November 7, 2002. Defendants represent that applicants who appear for such face-to-face interviews are not, as a matter of policy, terminated while their applications are pending. Finally, city defendant's October 25, 2002 Notice informed Ms. Olson of her right to request either a conference ("an informal meeting") or a fair hearing to appeal the termination decision, but did not inform her of her right to aid-continuing during the pendency of that hearing. Ms. Olson's deadline for requesting a fair hearing was December 24, 2002.

By letter dated October 29, 2002, Mr. Doyle requested a fair hearing on Ms. Olson's behalf. In that letter, Mr. Doyle requested aid-continuing during the pendency of Ms. Olson's appeal. On November 1, 2002 state defendants responded to Mr. Doyle's request with a computer-generated form stating "there is no aid-continuing for disaster MA." That same day, city defendant's Early Resolution Unit sent a letter to Ms. Olson proposing that she withdraw her fair hearing request and reapply for Medicaid.

On November 7, 2002, plaintiff sought an Order to Show Cause for the purpose of scheduling the briefing of its Motion for Preliminary Injunction to enjoin defendants from terminating Ms. Olson's

benefits during the pendency of her fair hearing request. At a November 7, 2002 conference before this court, defendants agreed to continue Ms. Olson's coverage while a new application for Medicaid was completed on her behalf. Defendants also agreed to investigate the eligibility of any DRM recipients brought to their attention who had been terminated from the DRM program for failure to keep a face-to-face interview. Defendants did not agree to provide aid-continuing to DRM recipients based on their timely request for a fair hearing.

On November 18, 2002, plaintiff's counsel informed defendants that two members of plaintiff's proposed class, Theresa Fisher and her son Francisco, were in need of assistance. Ms. Fisher and her son applied for and received DRM on October 1, 2001. In August 2002, Ms. Fisher received a notice informing her that her family's health coverage would be terminated for failure to keep her scheduled face-to-face interview, of which she claims she had no prior notice. Ms. Fisher visited her local Medicaid office on August 14 and 15, 2002 to provide the necessary documentation to continue her coverage. Nevertheless, on August 29, 2002, Ms. Fisher received a Notice of Decision informing her that her coverage was being terminated as of September 11, 2002. Ms. Fisher timely requested a fair hearing to appeal that ineligibility determination but was not granted aid-continuing pending that hearing. For reasons unclear from the record, Ms. Fisher's Medicaid was re-activated on November 15, 2002, prior to counsel's intervention. In the two months preceding the re-activation of her Medicaid, Ms. Fisher, who was without health coverage, was forced to forego treatment for her ovarian cancer. Francisco Fisher's Medicaid was not re-activated until November 22, 2002, following the intervention of counsel. In both cases, defendants made an eligibility determination prior to reacti-vating coverage. Thus neither were granted aid-continuing pending their fair hearing requests.

## I. Mootness

Defendants challenge the named plaintiff's ability to maintain this action on the grounds that defendants' extension of benefits to her following the November 7, 2002 hearing renders the motion for a preliminary injunction moot.

 "The judicial power of Article III courts extends only to cases and controversies specified in that Article." *Sosna v. Iowa*, 419 U.S. 393, 402, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (internal quotations omitted). Thus a federal court's jurisdiction can be invoked "only where a plaintiff . . . has suffered some threatened or actual injury resulting from the putatively illegal action." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotations omitted). In the class action context, there must be "a named plaintiff who has . . . a case or controversy at the time the complaint is filed." *Sosna*, 419 U.S. at 402, 95 S.Ct. 553. Moreover, that named plaintiff must show a threat of injury that is "real and immediate, not conjectural or hypothetical." Id. at 403, 95 S.Ct. 553 (internal quotations omitted).

 Generally, where an individual plaintiff's injury has been ameliorated, an action cannot be maintained. The Supreme Court, however, has recognized several exceptions to this mootness doctrine in the class action context. The first applies where the claim in question is "capable of repetition, yet evading review," that is, where the alleged illegal act is likely to continue but, by its inherent nature, is of such short duration that it is unlikely that any plaintiff could maintain an action challenging it. *Gerstein v. Pugh*, 420 U.S. 103, 110n, 95 S.Ct. 854, 43 L.Ed.2d 54.11 (1975) (finding that plaintiff's claim of detention

without probable cause constitutes a "suitable exception" to the mootness doctrine on the grounds that "it is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class"). The second, related exception is generally applied to classes already-certified under Federal Rules of Civil Procedure Rule 23(b), when a claim is deemed moot as to the named plaintiff, but clearly persists as to remaining class members. *See Sosna,* 419 U.S. at 393, 95 S.Ct. 553 ("the termination of a class representative's claim does not moot the claims of the unnamed members of the class"). Because "some claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires," the Supreme Court has held that certification is not a pre-requisite to applying this exception. *See U.S. Parole Commission v. Geraghty,* 445 U.S. 388, 399, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). In applicable cases, certification is "related back" to the filing of plaintiff's complaint. Id. at 52; *Robidoux v. Celani,* 987 F.2d 931 (2d Cir.1993) (applying relation back doctrine to claim involving social welfare department's delayed processing of applications where the class had not yet been certified). Central factors to be considered in applying the relation back doctrine are the inherently transitory nature of the asserted claim, *see Robidoux,* 987 F.2d at 933, and the likely ability of defendants to circumvent judgment by "picking off" named plaintiffs through the mooting of individual claims. *White v. Mathews,* 559 F.2d 852, 857 (2d Cir.1977). In *White,* for example, the Court of Appeals of the Second Circuit applied the relation back doctrine to a claim challenging delays in administrative hearings to prevent the SSA from "avoid[ing] judicial scrutiny ... by the simple expedient of granting hearings to plaintiffs who seek, but have not yet obtained, class certification." *Id.* at 857. That precedent is directly applicable here.

■■■ Plaintiff brings this motion on behalf of all DRM recipients who have timely requested, or will in the future, timely request fair hearings to contest termination of benefits, claiming a violation of due process rights arising from defendants' failure to provide aid-continuing during the pendency of those hearings. This claim is inherently transitory in nature. A DRM recipient who is denied benefits has 60 days in which to apply for a fair hearing. Following that application, federal and state regulations dictate that a fair hearing must be issued within 90 days. *See* 42 C.F.R. § 431.244(f); 18 N.Y.C.R.R. § 358–6.4(a). Moreover, as in *White,* defendants' voluntary actions to resolve the named plaintiff's claim should not be allowed to serve as a mechanism for avoiding judicial scrutiny of allegedly unconstitutional acts against plaintiff's proposed class. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 609, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). For the reasons stated, this court retains jurisdiction to hear plaintiff's claims in relation to the class plaintiff seeks to represent.

## II. Standard for Granting Preliminary Injunction

■■■ A party seeking a preliminary injunction must ordinarily demonstrate " a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to

the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir.1997). Defendants argue that, because the action to be enjoined in this case is "government action taken in the public interest pursuant to a statutory or regulatory scheme," plaintiff must satisfy the higher likelihood of success standard as discussed in *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) and *Medgar Evers Houses Assoc. v. Carro*, 2001 WL 1456190, *3, 2001 U.S. Dist. LEXIS 18594, at *9 (E.D.N.Y.2001).

■ Plaintiff argues that the higher likelihood of success standard is applicable only where the challenged governmental conduct was taken pursuant to "legislation or regulations developed through presumptively reasoned democratic processes," *Able v. U.S.*, 44 F.3d 128, 131 (2d Cir.1995), and is therefore inapplicable to this case. I agree. The heightened requirement "reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Karmel v. City of New York*, 200 F.Supp.2d 361, 365 (S.D.N.Y.2002). Where a challenged governmental action is not the result of democratic processes taken pursuant to the public interest, the higher standard is inapplicable. *See Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir.1992) (finding "Congress' broad grant of authority in the INA" insufficient to require satisfaction of higher standard); *Seabrook v. City of New York*, 1999 WL 694265, *2, 1999 U.S. Dist. LEXIS 13729, *7–8 (S.D.N.Y.1999) (applying lower standard where Department of Corrections policy was not implemented pursuant to legislation or regulation).

■ Defendants in this case, no matter how salutary their purpose, were not acting pursuant to statutory or regulatory authority when they developed the parameters of DRM coverage. Nor can it be said that their actions, taken pursuant to negotiations between a handful of state and federal officials over the terms of an application for a waiver of the federal government's regulatory requirements, were the result of "reasoned democratic processes." *See Karmel*, 200 F.Supp.2d at 365 n. 2 ("internally devised and implemented procedures arguably fall within the realm of government action which is not entitled to the higher degree of deference"). On the contrary, because of the exigent circumstances surrounding September 11, the "lengthy public debate" that the *Able* court found so critical, 44 F.3d at 131, was lacking at the time the parameters of DRM coverage were established. Accordingly, the lower preliminary injunction standard may be applied to this motion.

■ Defendants alternatively contend that the higher standard should apply in this case because granting plaintiff's injunction would provide the movant with "substantially all the relief sought." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996). Defendants are correct that, where a preliminary injunction seeks the same relief as that set forth in the underlying complaint, the moving party must make a "clear" or "substantial" showing of a likelihood of success. *See Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995); *Reynolds v. Giuliani*, 35 F.Supp.2d 331, 338 (S.D.N.Y.1999). That standard is inapplicable here, however, because plaintiff's motion seeks only prospective relief in the form of adequate notice to persons who have not yet received a Notice of Decision terminating benefits of their right to a fair hearing and

to aid-continuing and the provision of aid-continuing to DRM recipients who have timely requested, or will in the future timely request, a fair hearing. Plaintiff's amended complaint, in contrast, seeks "issuance of new, timely and adequate notices" to all persons terminated during the DRM transition process, whether or not they have requested a fair hearing, and "restoration of terminated Medicaid coverage" to those applicants who were not granted aid-continuing during the pendency of their fair hearing requests. Such retrospective relief differs substantially from that sought in plaintiff's preliminary injunction motion. Moreover, as plaintiff notes, the relief afforded by the granting of a preliminary injunction will be of short duration and is, in large measure, in the control of defendants. Defendants have also emphasized that only a relatively small number of the total DRM population would be subject to any prospective relief. In sum the higher standard of "clear" or "substantial" likelihood of success is inapplicable in this case. In any event, as will be seen, plaintiff has established a substantial likelihood of success on the merits in this case.

### 1. Irreparable Harm

■ Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez*, 175 F.3d at 233–234; *Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). To prove irreparable harm, a movant must demonstrate an injury "that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Rodriguez*, 175 F.3d at 234; *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995). In *Goldberg v. Kelly*, the Supreme Court observed that the denial of subsistence benefits to eligible applicants may deprive such applicants of the "very means by which to live." 397 U.S.

254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Thus, "to indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury." *Reynolds*, 35 F.Supp.2d at 339 (quoting *Morel v. Giuliani*, 927 F.Supp. 622, 635 (S.D.N.Y. 1995)).

■ Plaintiff seeks a preliminary injunction on behalf of those DRM recipients who have received or in the future receive a Notice of Decision terminating their DRM coverage and who have timely requested or will in the future timely request a fair hearing to appeal that termination. Defendants in this case have demonstrated admirable efforts to ensure that DRM recipients who are in the process of making the transition to traditional Medicaid do not suffer a lapse in coverage while their Medicaid applications are pending. These efforts are irrelevant, however, to the harm suffered by DRM recipients who have been denied benefits as they await the outcome of their timely-requested fair hearings. Nor can defendants' prevail on their argument that these DRM recipients will not suffer harm during the pendency of their fair hearings because of the three month "look-back" period provided under state law. A recipient of DRM who is denied benefits and is consequently unable to obtain medical services during the pendency of a fair hearing may suffer irreparable harm based on his or her inability to obtain potentially life-saving treatment and/or medications during that time period. The award of retroactive benefits cannot ameliorate the harm suffered if such a recipient should be forced by circumstances to forego treatment or medication.

While both plaintiff and proposed class members Theresa and Francisco Fisher have new successfully obtained Medicaid coverage, that coverage was obtained only following a new eligibility determination by defendants. All three filed timely re-

quests for fair hearings and were told that they were not entitled to aid-continuing during the pendency of those hearings. Plaintiff is an indigent breast cancer patient who cannot afford medical treatment absent Medicaid benefits. Ms. Fisher is an indigent ovarian cancer patient who suffered actual cessation of benefits while her fair hearing request was pending and, consequently, had to forego medical treatment during that time period. These are but two examples of the type of irreparable harm potentially facing DRM recipients to whom the preliminary injunction would apply. Of the 343, 740 recipients of DRM, a significant portion undoubtedly suffer from cancer and other serious conditions such as heart disease, hypertension, diabetes, asthma and tuberculosis. These conditions, if left untreated, are potentially life-threatening. Given defendants' representation at the February 11, 2003 conference that DRM recipients who have requested home visits because of disability have been among the last to be scheduled for face-to-face meetings, it seem likely that a disproportionate number of the DRM recipients who have not yet completed defendants' transition process, and thus would be beneficiaries of a preliminary injunction, suffer from such potentially serious conditions. Nor can it simply be assumed, as defendants argue, that eligible individuals will be identified by defendants prior to the termination of their benefits. It has not been disputed that a substantial number of those individuals who seek a fair hearing are successful. Chronically-ill DRM recipients who are deemed ineligible for benefits surely face the threat of irreparable harm should they be forced to forego medical treatment during the pendency of their timely-requested fair hearings. Thus, plaintiff has satisfied the first prerequisite for the granting of a preliminary injunction.

## 2. Substantial Likelihood of Success on the Merits

The parties agree that the likelihood of success of plaintiff's underlying due process claim turns on the question of whether or not a traditional Medicaid recipient's admitted due process right to a pre-termination fair hearing, *see* 42 C.F.R. § 431.205(d) (providing that Medicaid hearing system "must meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)"), attaches to the type of benefits extended to New York City residents in the form of DRM. If DRM is found to be an entitlement to which such due process rights apply, the proposed class has suffered a deprivation of constitutional rights as a result of defendants' failure to provide a pre-termination fair hearing. *See Goldberg v. Kelly,* 397 U.S. 254, 261, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (where statutory entitlement to subsistence benefits exist "due process requires an adequate hearing before termination"). If not, no infringement of rights will be found.

Defendants argue that the termination of DRM without the provision of aid-continuing during the pendency of timely-requested fair hearings does not trigger constitutional due process rights because: (1) the provision of DRM benefits was of time-limited duration; and (2) DRM recipients are akin to applicants deemed "presumptively eligible" for Medicaid and therefore are no more entitled to aid-continuing than a first-time Medicaid applicant, as to whom there is no right to a pre-termination hearing. 18 N.Y.C.R.R. § 358–3.6(2).

Defendants' arguments are not persuasive. Defendants agree that DRM was the only form of state medical assistance available to new applicants (and those Medicaid recipients scheduled for re-certification, *see* FN 2, *supra* ) in the four month period

following the destruction of the state defendants' computer system on September 11, 2001. As defendants have represented to the court, even if an applicant completed a traditional Medicaid application during the four month period between September 11, 2001 and January 31, 2002, defendants treated that application as a DRM application because the defendants were not capable of processing traditional Medicaid applications. Thus, the only way to apply for Medicaid relief during the time period in question was through DRM.

Medicaid is a statutory right for those entitled to receive it. *See Goldberg*, 397 U.S. at 261–263, 90 S.Ct. 1011. Plaintiff's proposed class indisputably consists of some individuals eligible for Medicaid coverage who were placed on DRM because defendants were incapable of processing traditional Medicaid applications on their behalf. Thus, some DRM recipients unquestionably would have been entitled to pre-termination fair hearings as traditional Medicaid recipients but for defendants' inability to process their traditional Medicaid applications. At least as to this group, plaintiff has demonstrated a substantial likelihood of success on the merits. Unfortunately, it is not possible, at this time, to determine which DRM recipients would have been eligible for traditional Medicaid had defendants been capable of processing their applications.

Defendants' decision to extend DRM recipients' coverage beyond the original four month grant period also militates in favor of a finding that DRM recipients are more akin to traditional Medicaid recipients than "presumptively eligible" applicants for the purposes of assessing their due process rights. To begin with, the mere categorization of DRM as a "presumptively eligible" demonstration project under the terms of defendants' waiver from the federal government is not dispositive of the question before the court. Treating DRM as a "presumptively eligible" demonstration project was simply the formal mechanism for obtaining federal government approval of the program. Indeed, as described above, the DRM population included traditional Medicaid recipients who were scheduled for re-certification during the four month period that DRM was in effect as well as individuals who would have qualified for traditional Medicaid had defendants been capable of processing traditional Medicaid applications. Even if, as defendants argue, the provision of temporary benefits do not trigger a due process right to a pre-termination hearing when such benefits expire by their own terms, *see In the Matter of Ada Sharp v. De Buono*, 278 A.D.2d 794, 797, 723 N.Y.S.2d 279 (2d Dept.2000) (finding no right to timely notice where transportation grant expired without any additional action by state agency), *but see Williams v. Blum*, 513 F.Supp. 753, 756 (W.D.N.Y.1981) (finding a statutory right to aid-continuing prior to termination of "predetermination grants"), DRM did not expire by its initial terms. Rather, DRM recipients were automatically granted extended coverage for up to one year. Thus, they were provided with Medicaid benefits for the same period as traditional Medicaid recipients. In addition, DRM recipients, like traditional Medicaid recipients scheduled for re-certification, were informed that they need not initiate an application process until contacted by defendants. In contrast, recipients of "presumptively eligible" Medicaid grants other than DRM complete a traditional Medicaid application and receive benefits while awaiting an eligibility determination. Because DRM recipients were receiving the same benefits, for the same period of time as traditional Medicaid beneficiaries and, like the latter, were not required to initiate the application process, I find that plaintiff is likely to establish that the non-time-limited grant of DRM is

more akin to traditional Medicaid than the time-limited grants defendants have extended in the past to "presumptively eligible" applicants and that DRM recipients are entitled, under the Due Process Clause, to aid-continuing during the pendency of timely-requested fair hearings.

### 3. Equitable Considerations

▮ Finally, because a preliminary injunction is an exercise of equitable authority, a court considering such a motion should consider the balance of equities, including the public interest, involved. *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125 (2d Cir.1998); *Medgar Evers*, 2001 WL 1456190, *3, 2001 U.S. Dist. LEXIS 18594, at *9. In this case the equities support granting the preliminary injunction. The proposed preliminary injunction applies to persons who may be irreparably harmed by defendants' continued action. The availability of retroactive reimbursement in the event of a finding that a DRM recipient was incorrectly denied traditional Medicaid will not assist those who, like Ms. Fischer, are forced by circumstances to forego medical treatment altogether during the time that their fair hearings are pending. Moreover, a DRM recipient's inability to address his or her basic needs during the pendency of a fair hearing may "adversely affect his ability to seek redress." *Goldberg*, 397 U.S. at 264, 90 S.Ct. 1011. Defendants, moreover, have repeatedly represented that the number of persons affected by the proposed preliminary injunction is relatively small and that the vast majority of DRM recipients have already been notified of their eligibility status. A mechanism for recouping the cost of aid-continuing benefits where a fair hearing affirms termination exists under state law. *See* 42 C.F.R. § 431.230(b); N.Y. Soc. Serv. L. § 369(2)(a)(i) and (b)(i). Given the limited resources of the DRM recipient population, it is unlikely that defendants will be able to recoup their costs in most cases. Nevertheless, some relief may be available where denial is based on a recipient's income level. Thus a balance of equities weighs in plaintiff's favor.

In sum, the granting of a preliminary injunction here is in the public's interest. As the Supreme Court noted in *Goldberg v. Kelly*, "public assistance . . . is not mere charity, but a means to promote the general Welfare." Id. at 265, 90 S.Ct. 1011. The same public interests that counseled the provision of DRM, counsel the extension of due process rights to DRM recipients.

### Conclusion

Accordingly, plaintiff's motion is granted to the following extent. A preliminary injunction in the following form will issue:

> In accord with the Opinion and Order issued by this court on February 14, 2003, defendants are ordered to provide notice to all Disaster Relief Medicaid recipients who, from this date forward, are issued Notices of Decision terminating their benefits of their right to a fair hearing and to aid-continuing during the pendency of that hearing. It is further ordered that aid-continuing be provided to those recipients who, having received such notice, from this date forward, timely request a fair hearing.

In addition, plaintiff is entitled to preliminary injunctive relief in the form of aid-continuing to all DRM recipients who have been issued a Notice of Decision terminating their benefits and who have timely requested or who in the future timely request a fair hearing and who have not yet been issued a fair hearing decision. The parties are to submit papers, no later than noon on February 28, 2003, addressing how these individuals will be identified and be provided with aid-continuing so that the court can fix the terms of the relief ordered as to this group. Upon review of

the parties' submissions, the court will issue an additional preliminary injunction as to this group.

The parties are directed to promptly submit either an agreement on class certification for the approval of the court or a schedule for the briefing of a motion for class certification. The parties are further directed to advise the court as to whether they seek any additional discovery and to propose a schedule for its prompt completion.

Following the completion of discovery, defendants may renew their motions to dismiss in accordance with a schedule to be agreed upon by the parties. The parties are further directed to contact Magistrate Judge Cheryl L. Pollak's chambers for the purpose of settlement discussions.

SO ORDERED.

### *ORDER*

Defendants' applications for a stay of the Preliminary Injunction pending appeal is denied.

**SO ORDERED.**